**[J-17-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| IN THE INTEREST OF: A.A., A MINOR | : No. 28 MAP 2017 |
| | : |
| | : |
| | : Appeal from the Order of the Superior |
| APPEAL OF: A.A. | : Court at No. 1931 MDA 2015 dated |
| | : October 18, 2016 Affirming the Order |
| | : of the Dauphin County Court of |
| | : Common Pleas, Juvenile Division, at |
| | : No. CP-22-JV-0000144-2015 dated |
| | : September 28, 2015. |
| | : |
| | : ARGUED:  April 10, 2018 |


**OPINION**


JUSTICE DOUGHERTY                                        DECIDED:  October 17, 2018

We granted discretionary review to resolve inconsistencies between the Superior

Court's decisions in *Commonwealth v. Kemp*, 961 A.2d 1247 (Pa. Super. 2008) (*en banc*)

and *Commonwealth v. Nguyen*, 116 A.3d 657 (Pa. Super. 2015), specifically with regard

to whether information obtained by a police officer during a lawful initial traffic stop may

be used to justify re-engagement with the driver after the police officer indicates the driver

is free to go, such that consent to search given during that re-engagement is valid.  We

conclude, under the circumstances of this case, the consent given was valid and

suppression of evidence was not warranted.  Accordingly, we affirm the order of the

Superior Court.

On January 9, 2015, Sergeant Christopher Still of the Halifax Area Regional Police

Department was on routine patrol, in the area of Market and North 2nd Streets in Halifax,

Dauphin County, when he observed a black sedan straddling the yellow center line as it

traveled the highway. N.T. 8/6/15 at 4-5. Sergeant Still followed the vehicle and conducted a registration check, which showed the vehicle's registration was expired. *Id.* at 5. Based on the expired registration, Sergeant Still stopped the vehicle. *Id.*

Sergeant Still identified the driver as seventeen year old A.A. (appellant) and the adult passenger as Kyle Lewis. *Id.* Although appellant appeared to be confused and sluggish, she provided Sergeant Still with her driver's license and an expired registration card, but failed to provide any proof of financial responsibility. *Id.* at 5-6. Sergeant Still took the documents back to his patrol car where he began preparing a citation for the expired registration and a warning for the failure to provide proof of financial responsibility. *Id.* at 6. During this time, Sergeant Still observed Lewis make furtive movements inside the vehicle and briefly open and close the passenger door. *Id.* Sergeant Still returned to appellant's vehicle and issued the citation and warning, at which time he smelled an odor of marijuana emanating from the interior of the vehicle. *Id.* at 7. Nevertheless, Sergeant Still "briefly broke contact with [appellant] by bidding her a good night" and stating she was free to go. *Id.* at 7, 22.

However, Sergeant Still began talking to appellant again.[1] *Id.* Specifically, Sergeant Still asked appellant if there was anything illegal in her vehicle, appellant cut him off and said "no," and asked if he would like to search the vehicle. When Sergeant Still responded that he wanted to search the vehicle, Lewis voluntarily stated there was a marijuana pipe in the car and that he and appellant had smoked marijuana prior to driving. *Id.* At this time, Sergeant Still asked appellant to step out of the vehicle and when she complied, he observed a light green pill on the driver's seat. *Id.* at 7-8. Sergeant Still

---

[1] The record does not reveal how much time elapsed between the time Sergeant Still "briefly broke contact" with appellant and then re-engaged her in conversation, nor does it specify how far from appellant's vehicle he had traveled before beginning to talk with her again.

directed appellant to stand at the back of the vehicle and also asked Lewis to step out of the vehicle. *Id.* at 8. During a pat-down search of both occupants for his safety, Sergeant Still discovered a BB gun in Lewis's waistband. *Id.* Sergeant Still removed the BB gun and handcuffed Lewis. *Id.*

Sergeant Still proceeded to search the vehicle. He recovered a small pill bottle from the passenger door which contained marijuana residue, the green pill from the driver's seat, and a marijuana pipe from appellant's handbag. *Id.* at 8-9. Lewis claimed the pill bottle belonged to him and appellant stated the green pill was a Klonopin, she had taken one earlier in the night, and had also smoked marijuana earlier in the night. *Id.* at 9-10. Following the search, Sergeant Still administered two field sobriety tests to appellant, both of which showed signs of impairment, and he placed her under arrest. *Id.* at 10-11.

A delinquency petition was filed alleging appellant committed the delinquent acts of DUI - Impaired Ability, Possession of a Controlled Substance, Possession of Drug Paraphernalia, Disregard of Traffic Lanes, and Driving an Unregistered Vehicle.[2] Appellant filed a motion to suppress evidence alleging the re-engagement — during which the search was conducted and the drugs and paraphernalia were discovered — was a second investigative detention which was not based on reasonable suspicion. Sergeant Still testified to the above facts at the suppression hearing. When asked why he broke off contact after the initial stop and then re-engaged appellant a second time, Sergeant Still stated "[i]t's just best practice. Even if I had stopped somebody and we were trying to get a consent [to] search, it's just best practice." *Id.* at 14. The court denied the motion to suppress, appellant proceeded to an adjudication and disposition hearing, and the

---

[2] 75 Pa.C.S. §3802(d)(2), 35 P.S. §780-113(a)(16), (32), 75 Pa.C.S. §3309(1), and 75 Pa.C.S. §1301(a), respectively.

court found the DUI - Impaired Ability, Possession of a Controlled Substance, Possession of Drug Paraphernalia, and Disregard of Traffic Lanes allegations to be substantiated. The court also changed the Driving an Unregistered Vehicle allegation to DUI - Controlled Substance or Metabolite, and held that charge was substantiated as well.[3] Appellant was adjudicated delinquent, found to be in need of treatment, supervision, or rehabilitation, was placed on probation, and had her driver's license suspended for one year.

On appeal to the Superior Court, appellant challenged the denial of her suppression motion and the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a). Relying on *Kemp*,[4] the trial court looked to the totality of the circumstances, including appellant's confused and sluggish appearance, Lewis's furtive movements and opening of the passenger door, and the odor of marijuana emanating from the vehicle, all of which were observed by Sergeant Still during the initial traffic stop. Trial Court Opinion, slip op. at 6-8. Based on these facts, the trial court held the consent to search was valid because it was given during a legal detention when Sergeant Still possessed the requisite reasonable suspicion to believe appellant was involved in criminal activity and suppression was not warranted. *Id.* at 8.

Appellant argued to the Superior Court that Sergeant Still's actions of bidding her goodnight and breaking contact terminated the initial traffic stop and his re-initiation of contact amounted to a second investigative detention. Relying on the Superior Court's

---

[3] 75 Pa.C.S §3802(d)(1).

[4] As we discuss in more detail *infra*, the *en banc* panel in *Kemp* held that, when determining whether reasonable suspicion exists, a court may look to the totality of the circumstances to "consider all facts at the officer's disposal and does not require the court to disregard those adduced during a valid interdiction, which is, in the present case, the [initial] traffic stop." 961 A.2d at 1258.

decision in *Nguyen*,[5] appellant argued Sergeant Still lacked reasonable suspicion to detain her a second time as he was required to formulate new reasonable suspicion based upon facts entirely separate from his observations during the initial traffic stop and that her consent given during that second illegal detention was invalid. The Commonwealth agreed appellant was subject to a second detention, but argued, pursuant to *Kemp*, the calculation of whether Sergeant Still possessed reasonable suspicion to conduct that second detention must include every fact and circumstance known to him at that time, including his observations during the initial traffic stop.

The three-judge Superior Court panel concluded it was bound by the *en banc* decision in *Kemp*, and thus rejected the limited reasonable suspicion analysis employed by appellant. *In Interest of A.A.*, 149 A.3d 354, 361 (Pa. Super. 2016).[6] Instead, the panel considered the totality of the circumstances to determine whether Sergeant Still possessed reasonable suspicion for the second detention, and in this analysis, the panel included facts learned and observations made during the initial traffic stop. *Id.* at 361-62. The panel held it was reasonable under the totality of the circumstances for Sergeant Still to believe appellant was engaging in criminal activity, *i.e.*, driving under the influence of a controlled substance or metabolite, and her consent given during this detention was therefore valid. *Id.* at 362.

We accepted review to address the following question raised by appellant: "Whether the Superior Court's reliance on *Commonwealth v. Kemp* to affirm the trial

---

[5] The *Nguyen* panel held information learned during an initial traffic stop cannot serve as the basis of reasonable suspicion for a secondary detention. 116 A.3d at 669.

[6] The majority opinion by President Judge Emeritus John T. Bender was joined by President Judge Emeritus Kate Ford Elliot. President Judge Emeritus Correale Stevens authored a concurring opinion in which he agreed the second detention was legal and noted the majority's discussion of *Nguyen* was unwarranted because the panel was bound to follow the *en banc* decision in *Kemp*. *A.A.*, 149 A.3d at 362 (Stevens, P.J.E., concurring).

[c]ourt's denial of [p]etitioner's Motion to Suppress Evidence was in contradiction with the recent holding of a different Superior Court [p]anel, *Commonwealth v. Nguyen*?" *In Interest of A.A.*, 169 A.3d 1026 (Pa. 2017) (*per curiam*). Our standard of review over an order denying suppression requires us to "consider only the Commonwealth's evidence and so much of the defense's evidence as remains uncontradicted when read in the context of the record as a whole. Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Johnson*, 160 A.3d 127, 138 (Pa. 2017), *cert. denied*, 138 S.Ct. 508 (2018) (internal citations omitted). However, as here, "where the appeal . . . turns on allegations of legal error, the suppression court's conclusions of law are not binding" as it is this Court's duty "to determine if the suppression court properly applied the law to the facts." *Commonwealth v. Mistler*, 912 A.2d 1265, 1269 (Pa. 2006) (internal brackets and citation omitted). As such, the legal conclusions of the lower courts are subject to our plenary review. *Id.*

Appellant argues the Superior Court's holding in this case, most importantly its reliance on *Kemp,* is in conflict with that court's more recent decision in *Nguyen.* Appellant suggests this Court should adopt the reasoning of the *Nguyen* panel rather than that of *Kemp* and the panel below. Appellant contends the adoption of *Nguyen* is necessary to protect the rights of motorists and end the deceptive police practice of disengaging and re-engaging in the hope of securing a consent to search, the purpose of which — according to appellant — is to attempt to de-escalate the interaction from an investigative detention to a mere encounter.[7] In support of this argument, appellant relies

---

[7] In other cases including *Nguyen*, for example, the officers testified they broke contact with the subject of a traffic stop and then re-engaged that subject with the intent of turning the investigatory detention into a mere encounter. *See Nguyen*, 116 A.3d at 667, *quoting* N.T. 6/20/13 at 52 ("Thus, when asked again why he re-engaged the driver, Trooper Bromberg testified that 'before I could ask for a consent to search, the driver has to feel

on *Commonwealth v. Freeman*, 757 A.2d 903 (Pa. 2000), where this Court referred to such re-engagement as a "second seizure" of the driver, rather than a mere encounter. *See* Appellant's Brief at 16-18, *citing Freeman*, 757 A.2d at 904-08 ("[*Freeman*] Court alluded to its displeasure" with officer's attempt to "transform the interaction from a custodial detention to a mere encounter" and "decided that the second round of questioning constituted a seizure"). Appellant further quotes *Freeman* in alleging that decision stands for the proposition that facts learned during an initial traffic stop may not be used as the basis for reasonable suspicion to conduct a second detention of a driver. Appellant's Brief at 18, *quoting Freeman*, 757 A.2d at 908 ("'While the trooper undoubtedly suspected that Freeman wished to conceal the fact that she was traveling with the other vehicle, such suspicion had been present when he gave Freeman a warning and told her that she was free to go. Nothing had happened after the conclusion of the traffic stop to provide any further cause for suspicion[.]'"). According to appellant, the Superior Court later relied on this characterization in *Freeman* to preclude the use of information gathered during an initial stop to support a re-engagement. *See* Appellant's

---

free to leave.' Explaining further, he stated: 'Before the driver was — in order to get consent, I had to turn it into a mere encounter'"). Similarly, in this case, Sergeant Still acknowledged he broke contact and then re-engaged because he considered it "best practice." N.T. 8/6/15 at 14.

The parties and *amicus curiae* refer to a common perception among police officers that this practice of breaking off contact and then re-engaging with a driver automatically transforms the interaction from what was initially an investigative detention (the traffic stop) into a new mere encounter, and thus negates the requirement of reasonable suspicion for the new interaction during which consent to search might be obtained, but our case law does not support such a view. *See, e.g.*, *Commonwealth v. Freeman*, 757 A.2d 903, 907 (Pa. 2000) ("[T]he police/citizen encounter involving Freeman opened with a lawful traffic stop, the existence and nature of which is a pertinent factor in assessing whether a reasonable person would have felt free to leave during the subsequent interaction. . . . The transition to and character of the subsequent interaction, however, supports the conclusion that Freeman was subject to a second seizure.").

Brief at 18-24, *citing Commonwealth v. Ortiz*, 786 A.2d 261 (Pa. Super. 2001), *overruled by Kemp* (reasonable suspicion supporting second detention must be independent of information learned during initial traffic stop); *Commonwealth v. Johnson*, 833 A.2d 755 (Pa. Super. 2003), *overruled by Kemp* (same). Appellant's ultimate contention is this Court should require police officers to immediately act on reasonable suspicion such that "an officer may only reengage a motorist of this Commonwealth if clear, articulable and reasonable suspicion can be discerned from information learned after the initial traffic stop." Appellant's Brief at 25.[8]

In response, the Commonwealth recognizes the conflict between *Kemp* and *Nguyen* but submits the analysis in *Kemp* is not only correct, but also bound the panel below as an *en banc* decision. The Commonwealth further notes *Kemp* specifically overruled the decisions in *Ortiz* and *Johnson* to the extent "they hold that facts gathered during a valid traffic stop cannot be utilized to justify an investigatory detention occurring after a police officer has indicated that a defendant is free to leave." *Kemp*, 961 A.2d at 1260. The Commonwealth argues *Nguyen* is equally invalid as its holding is identical to the overruled holdings of *Ortiz* and *Johnson*.

The Commonwealth further contends adopting the *Nguyen* analysis instead of *Kemp* would make no sense, either practically or legally. Practically, the Commonwealth contends adopting the *Nguyen* analysis would punish cautious officers, as most officers

---

[8] The Pennsylvania Association of Criminal Defense Lawyers (PACDL) filed an *amicus curiae* brief supporting appellant in which it contends the police practice of stop, warn, and re-engage directly violates Article I, Section 8 of the Pennsylvania Constitution. PACDL further argues the Superior Court's decision in this case is contrary to *Freeman*, which it claims stands for the proposition there is no justification for re-engaging a motorist following the conclusion of a traffic stop based on facts obtained during that initial stop. PACDL continues, even if *Freeman* does not directly control the question posed here, this Court should adopt a bright line rule ending the stop, warn, and re-engage police tactic.

break contact and re-engage only to make sure they are acting in accordance with the law rather than to trick a motorist into consenting to a search. Legally, the Commonwealth argues the *Nguyen* analysis conflicts with the totality of the circumstances test which is universally used to determine whether an officer possessed reasonable suspicion for an investigative detention. The Commonwealth submits this Court should adopt the *Kemp* analysis and hold information gathered during an initial traffic stop may be used to justify a continued detention during which consent to search is granted, irrespective of an officer's intervening statement that the driver is "free to go." Essentially, the Commonwealth claims the officer's bidding appellant goodnight did not "break" the investigative detention into two parts, and thus consent to search was given during a legal detention supported by reasonable suspicion obtained earlier in that detention.[9]

---

[9] Until its brief in this Court, the Commonwealth consistently referred to the period of re-engagement as a "second" detention, as have appellant and the courts below, and this Court in *Freeman*. *See* Commonwealth's Superior Court Brief at 9 (referring to re-engagement as "second interaction"); Appellant's Brief at 27 (referring to re-engagement as "subsequent investigatory detention"); Trial Court Opinion, slip op. at 6 (referring to re-engagement as "investigative detention" following a lawful traffic stop); *A.A.*, 149 A.3d at 358 (referring to re-engagement as "second detention" and stating Commonwealth does not dispute appellant was detained when re-engaged); *Freeman*, 757 A.2d at 907 (referring to re-engagement as "second seizure"). The Commonwealth now views the situation as one "continued" detention, because appellant "never felt free to leave[.]" Commonwealth's Brief at 16. The Commonwealth argues that, under this view, there can be no question observations made during the entire encounter may be used to support reasonable suspicion for continuing the detention, such that consent to search given during the latter part of the stop was valid. *Cf. Kemp*, 961 A.2d at 1257 ("However, *Freeman* does not hold that facts garnered during a constitutionally-proper traffic stop cannot be utilized in assessing whether reasonable suspicion exists for a detention that **continues** after the reason for the traffic stop has been resolved.") (emphasis added).

As will be seen *infra*, under the specific circumstances of this case, the semantic distinction between a "second" or "continued" detention is immaterial to our analysis, which is premised upon a consideration of a totality of the circumstances. *See also Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609, 1615 (2015) (police officer may not prolong traffic stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). We refer at times to a "second" detention based on language from *Freeman*, where the Court observed "the arresting trooper articulated a

We recognize "the Fourth Amendment to the United States Constitution [protects] the people from unreasonable searches and seizures." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014), *citing Commonwealth v. Smith*, 836 A.2d 5, 10 (Pa. 2003).[10] Our Fourth Amendment jurisprudence has developed three categories of interaction between private citizens and the police. *Id.* "[A] 'mere encounter[ ]' does not require any level of suspicion or carry any official compulsion to stop or respond ... an 'investigative detention[ ]' permits the temporary detention of an individual if supported by reasonable suspicion . . . [and] an arrest or custodial detention . . . must be supported by probable cause." *Id.*

Importantly, appellant does not challenge the legality of the initial traffic stop. Instead, she asserts she was subjected to an illegal second investigative detention following Sergeant Still's bidding her goodnight and breaking contact, because that second detention was not based on reasonable suspicion **independent** of observations made during the initial, completed stop. Appellant claims that, since her consent to search was given during this illegal second detention, her motion to suppress evidence should have been granted. To decide whether the Superior Court erred in affirming the denial of

---

clear endpoint to the lawful detention by advising Freeman that she was free to depart after returning her driver's documentation and issuing an appropriate traffic warning." 757 A.2d at 907. In this case, we may consider the initial traffic stop ended when Sergeant Still returned appellant's documents, issued a citation and warning, bid her goodnight, and stated she was free to leave. The "second" (or "continued") detention took place immediately thereafter. We need not determine in this appeal how or whether the analysis might change in a factually distinct scenario where, for example, the driver actually departs the scene, drives down the road a few feet or a few miles, and is then stopped again.

[10] Although appellant claims she is bringing this appeal under Article I, Section 8 of the Pennsylvania Constitution, Appellant's Brief at 10, she does not forward any argument that our Constitution provides greater protections than its federal counterpart in this context. Additionally, the cases proffered by appellant in support of her argument were all decided under the Fourth Amendment of the United States Constitution. As such, we review this matter by conducting an analysis of relevant Fourth Amendment jurisprudence.

suppression under these circumstances, we must first determine whether consent to search was given during an investigative detention that was supported by a reasonable suspicion appellant was engaged in criminal activity, and against what facts suspicion may be measured.

> A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 735 A.2d 673, 676 ([Pa.] 1999). 'This standard, less stringent than probable cause, is commonly known as reasonable suspicion.' *Id*. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001). In making this determination, we must give 'due weight . . . to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience.' *Cook*, 735 A.2d at 676, *quoting Terry v. Ohio*, 392 U.S. 1, 27 (1968). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, '[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer.' *Cook*, 735 A.2d at 676.

*Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004).

It is clear Sergeant Still obtained reasonable suspicion that appellant was involved in criminal activity during the initial traffic stop — the legality of which has not been challenged — as the odor of marijuana alone, particularly in a moving vehicle, is sufficient to support at least reasonable suspicion, if not the more stringent requirement of probable cause. *See United States v. Ventresca*, 380 U.S. 102, 111 (1965) (odor may be sufficient to establish probable cause); *see also Commonwealth v. Copeland*, 955 A.2d 396, 401-03 (Pa. Super. 2008) (same); *Commonwealth v. Stoner*, 344 A.2d 633, 635-36 (Pa. Super. 1975) (same). The pertinent question is whether Sergeant Still could use the reasonable suspicion he obtained from the smell of marijuana, as well as from observing appellant's confused and sluggish appearance and Lewis's furtive movements and opening of the passenger door — all of which he experienced during the initial traffic stop — to further engage or detain appellant even after he said "goodnight" and turned towards

his patrol car. Essentially, appellant views the "goodnight" as a break in the investigative action, so that the subsequent re-engagement constituted a second detention that required "new" information to create reasonable suspicion, while the Commonwealth asserts there was no "break" and the information gathered at the start of the encounter may be used to support continued detention. We conclude that although there was a "break" between the initial detention and the second detention during which consent to search was given, the smell of marijuana and the officer's other observations — experienced lawfully during the initial traffic stop — nevertheless provided reasonable suspicion for a legal detention during which appellant gave valid consent.

In consideration of the question presented, we first review the decision of the United States Supreme Court in *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609 (2015). In *Rodriguez*, a police officer stopped Rodriguez's vehicle for a violation of Nebraska's traffic laws. *Id.* at 1612. After conducting "all the business" of the stop, including running a records check, asking Rodriguez several questions, and issuing Rodriguez a warning, the officer conducted a canine sniff of Rodriguez's vehicle. *Id.* at 1613. Seven or eight minutes later, the canine alerted for drugs and the officer recovered a bag of methamphetamine. *Id.* Rodriguez filed a motion to suppress and a federal magistrate judge found no reasonable suspicion supporting the detention of Rodriguez following the issuance of the traffic violation warning. *Id.* However, relying on precedent from the Eighth Circuit Court of Appeals, the magistrate judge concluded the extension of the traffic stop by seven or eight minutes was a *de minimis* violation of Rodriguez's rights and thus suppression was not warranted. *Id.* The factual findings and legal conclusions of the magistrate judge were adopted by the district court and the Eighth Circuit Court of Appeals affirmed. *Id.* at 1613-14.

The United States Supreme Court vacated the decision of the Court of Appeals, disagreeing with the premise that the violation of Rodriguez's rights was *de minimis* and holding "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 1612, *quoting Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The High Court also stated "[a]n officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. As such, the Court remanded the case to the Eighth Circuit to consider whether "reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation[.]" *Id.* at 1616-17.

As the *Rodriguez* Court did not expressly address the situation present here — the detention of a driver following an officer's indication the driver was free to leave — we now turn to Pennsylvania jurisprudence which is more directly on point, beginning with this Court's decision in *Freeman*. In that case, troopers stopped Freeman's vehicle and another car, after observing the two vehicles traveling closely together, switching lanes, and jockeying for position. *Freeman*, 757 A.2d at 904. Freeman denied traveling with the other vehicle and gave her driver's license and registration card to the trooper as requested. *Id.* at 905. As the trooper conducted a check on Freeman's documents, he learned from another officer that the occupants of the second vehicle contradicted Freeman by stating they were indeed traveling together. *Id.* The trooper returned to Freeman's vehicle, gave back her documents, issued warnings for motor vehicle violations, and informed her she was "free to leave." The trooper then re-engaged

Freeman and again asked if she was traveling with the other vehicle. *Id*. When Freeman again denied doing so, the trooper advised her the occupants of the other car had contradicted her and then asked her to step out of her vehicle. Freeman complied and subsequently granted the trooper consent to search her vehicle. *Id*. The trooper recovered marijuana and Freeman was charged with possession of a controlled substance and possession with intent to deliver a controlled substance (PWID). *Id*. at 906.

Freeman filed a motion to suppress in which she contended her consent to search was tainted by an illegal detention. *Id*. The motion was denied and Freeman was convicted of both offenses following a bench trial. *Id*. On appeal, the Superior Court affirmed the denial of her suppression motion holding Freeman was not subject to a detention at the time she gave the trooper her consent to search the vehicle, as any interaction following the trooper's statement she was free to leave was a mere encounter rather than an investigative detention, and reasonable suspicion was not required to support the legality of that encounter. *Id*.

This Court accepted review and reversed the Superior Court, stating as follows:

To constitute a valid investigative detention, the seizure must be justified by an articulable, reasonable suspicion that Freeman may have been engaged in criminal activity independent of that supporting her initial lawful detention. The question of whether reasonable suspicion existed at the time of a detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the detainee of criminal activity. In the present case, however, there are no facts of record indicating that the trooper did possess, or could have possessed, a reasonable suspicion of criminal activity on Freeman's part. While the trooper undoubtedly suspected that Freeman wished to conceal the fact that she was traveling with the other vehicle, such suspicion had been present when he gave Freeman a warning and told her that she was free to go. Nothing had happened after the conclusion of the traffic stop to provide any further cause for suspicion; at most, Freeman's apparent reluctance to drive away may have strengthened the trooper's initial suspicion that the two vehicles were traveling together.

> Moreover, even if Freeman's answer to the trooper's question, contradicting as it did the information given by the occupants of the other car, could arguably be viewed as evasive behavior, such behavior was unaccompanied by any other indication of criminal activity. In particular, there was no testimony that the actions of Freeman and her companions were consistent with those of drug dealers or criminals of any other type; that their route was heavily traveled by drug dealers; or, indeed, that the trooper suspected Freeman of drug dealing or of any other specific crime. The noted inconsistency may give rise to an inchoate and unparticularized suspicion or hunch of criminal activity, but not to a reasonable suspicion of the same.

*Id.* at 908 (citations and internal quotation marks omitted). The Court concluded Freeman's consent to search was given during an illegal detention unsupported by an articulable reasonable suspicion she may have been engaged in criminal activity — independent of the traffic violation which supported her initial lawful detention — and suppression should have been granted. *Id.* at 908-09.

Following this Court's decision in *Freeman*, the Superior Court decided *Kemp*. Kemp was the passenger in a vehicle which was stopped by a state trooper for improperly tinted windows. *Kemp*, 961 A.2d at 1250-51. Upon approaching the vehicle, the trooper smelled an extremely strong odor of air fresheners which he believed indicated something illegal could be inside the vehicle. *Id.* at 1251. The trooper noted both Kemp and the driver appeared extremely nervous and also observed roughly twelve different air fresheners inside the vehicle. *Id.* The driver produced a New Jersey identification card which appeared to be counterfeit and Kemp produced a Florida driver's license. *Id.* At this time, the trooper detected a faint odor of marijuana emanating from inside the vehicle and, based on his training and experience in drug trafficking investigations, suspected Kemp and the driver were transporting marijuana. *Id.* The trooper issued the driver a warning for the improperly tinted windows and not having a driver's license, stated Kemp would have to drive, and told the driver "to have a nice day." *Id.* at 1252. Before returning to his vehicle, however, the trooper asked the driver if he could speak to her for a minute.

Following a conversation regarding her origin and destination, the trooper told the driver she was free to go. *Id.* The trooper returned Kemp's driver's license, shook his hand, and told him to have a nice day. *Id.* Just as he had with the driver, the trooper re-initiated contact with Kemp and asked if he could speak to him for a minute. *Id.* The trooper questioned Kemp regarding the details of his travel and asked if there were any "guns, drugs, or money" in the vehicle. *Id.* Kemp responded negatively and subsequently consented to a search of the trunk. *Id.* From the trunk of the vehicle, the trooper recovered a plastic bag containing marijuana. *Id.* Kemp was arrested and charged with drug offenses.

Kemp filed a motion to suppress in which he contended his consent to search was the product of an illegal detention. *Id.* The motion was denied and Kemp was convicted following a bench trial. *Id.* The Superior Court sitting *en banc* affirmed, holding Kemp was still subject to an investigative detention despite the trooper's return of his driver's license and statement he should "have a nice day." *Id.* at 1254. The court reasoned the totality of the circumstances, including the trooper's continued questioning of Kemp, established he was not actually free to leave despite the trooper's statement that he was. *Id.* The court nonetheless held the trooper possessed reasonable suspicion for this continued detention, based in part on all the information garnered during the initial lawful traffic stop, including the smell of air fresheners and marijuana. *Id.* In making this determination, the court expressly overruled *Ortiz* and *Johnson* and held the "totality of the circumstances approach allows the court to consider all facts at the officer's disposal and does not require the court to disregard those adduced during a valid interdiction, which is, in the present case, the traffic stop." *Id.* at 1258. The *Kemp* court explained *Ortiz*'s reliance on *Freeman* for its contrary conclusion was misplaced:

> We do not believe that *Freeman's* language supports *Ortiz's* proposition. The Supreme Court in *Freeman* quite plainly stated that in order to justify a

continued detention beyond the initial valid detention, which was the traffic stop, police needed reasonable suspicion that the defendant was engaged in criminal activity independent of that initial lawful detention. In other words, once police process the traffic violation, they cannot rely upon the traffic violation to prolong the detention; they need other information supporting reasonable suspicion.

In *Freeman,* no facts were ascertained during the traffic stop or thereafter to provide reasonable suspicion that the defendant was involved in criminal activity. The Court did not imply that anything discovered during the course of a traffic stop could not be utilized to justify an ensuing investigatory detention. Indeed, the Court actually analyzed what police were told during the traffic stop, which would imply, contrary to the holding in *Ortiz,* that those facts **can** be considered in determining whether reasonable suspicion existed for an investigatory detention initiated after a vehicular violation has been processed.

*Id.* (emphasis in original). The *Kemp* court concluded the trooper had reasonable suspicion to support the detention during which consent to search was obtained, and suppression was correctly denied. *Id.* at 1260.[11]

After *Kemp*, a three-judge panel decided *Nguyen*. Nguyen was a passenger in a vehicle stopped by state troopers for speeding. 116 A.3d at 660. Two troopers approached the driver, requested his license, and asked him to step out of the vehicle. *Id.* The driver stepped to the back of the vehicle and seemed to be nervous while speaking to the troopers. *Id.* at 661. During this time, one of the troopers asked Nguyen for his driver's license. *Id.* According to the troopers, Nguyen refused to answer questions and failed to make eye contact, but did provide his license. *Id.* A check of

---

[11] We are aware the *Kemp* court did not distinguish between a "first" and "second" detention, but rather viewed the encounter as "continuing" even after the officer ostensibly indicated Kemp was free to go. The *Kemp* court did not explain its use of different wording than that used in *Freeman*, but we note the two cases were factually distinct. The entire interaction between the trooper and Kemp, including the suggestion he could leave and the subsequent re-engagement, occurred while he stood outside the vehicle. *Kemp*, 961 A.2d at 1254. Freeman, on the other hand, was inside her vehicle when the trooper indicated she was free to go and, in theory, she might have more readily departed the scene. As we have stated, we need not resolve this disparity for purposes of deciding the present appeal.

Nguyen's information revealed he had been arrested numerous times for drug offenses. *Id.* When the trooper returned from processing the information in his patrol car, he issued warnings for motor vehicle violations, gave the driver and Nguyen their paperwork and licenses, and told the driver he was "free to go" and "to be careful pulling away." *Id.* The trooper walked back towards his patrol car but, before entering it, turned around and re-initiated contact with the driver. *Id.* The driver answered numerous questions during this conversation with the trooper and consented to a search of his vehicle, after which the trooper asked Nguyen to step out of the vehicle. *Id.* Upon exiting the vehicle, Nguyen placed his hands in his pockets but the troopers told him to keep his hands visible. *Id.* Nguyen was then asked whether he had any weapons, he said no, and the trooper asked whether he could frisk him for officer safety. *Id.* at 662. Nguyen complied and during the pat down, the trooper recovered, *inter alia*, four bags of cocaine and four jars of crack cocaine. *Id.* Nguyen was arrested and charged with various drug offenses.

Nguyen filed a motion to suppress in which he contended his consent to search was the product of an illegal detention. *Id.* The motion was denied and he was convicted of PWID following a bench trial. *Id.* On appeal, the Superior Court reversed the denial of Nguyen's motion to suppress. The panel found the facts surrounding the subsequent interaction, including the trooper's actions being inconsistent with his statement they were free to leave, led to the conclusion Nguyen was subject to a "second seizure." *Id.* at 667-68. The panel rejected the argument that Nguyen's criminal history could serve as reasonable suspicion to conduct a second detention because the troopers obtained that information during the initial traffic stop. *Id.* at 668-69. In addition, the panel held the driver's nervous behavior was insufficient, in and of itself, to establish reasonable suspicion for a new investigative detention. *Id.*

There is a clear and direct conflict between the Superior Court's decisions in *Kemp* and *Nguyen*. We note the panel below correctly relied on *Kemp* as it was a binding *en banc* decision. *See Commonwealth v. Bucknor*, 657 A.2d 1005, 1007 n.1 (Pa. Super. 1995) (three-judge panel bound by decisions of *en banc* court). Moreover, *Nguyen* was based on a rationale that was overruled by *Kemp*. *See Kemp*, 961 A.2d at 1260 (overruling "*Ortiz* and *Johnson* to the extent that they hold that facts gathered during a valid traffic stop cannot be utilized to justify an investigatory detention occurring after a police officer has indicated that a defendant is free to leave"). Of course, *Kemp* is not binding on this Court. We therefore proceed to determine whether its approach comports with relevant Fourth Amendment jurisprudence, including our decision in *Freeman* and the decision of the United States Supreme Court in *Rodriguez*.

As stated above, "[i]n order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered." *Rogers*, 849 A.2d at 1189, *citing D.M.*, 781 A.2d at 1163. This Court has previously stated we "consider[ ] **all relevant facts** under a totality of [the] circumstances analysis." *Commonwealth v. Hernandez*, 935 A.2d 1275, 1284 (Pa. 2007) (emphasis added). We have also stated "the totality of the circumstances test, by its very definition, requires that the **whole picture** be considered when determining whether the police possessed the requisite cause to stop appellant." *D.M.*, 781 A.2d at 1165 (emphasis added).

Although appellant relies on *Freeman* for her claim she gave consent to search during an illegal second detention, *Freeman* actually supports an "all relevant facts" and "whole picture" approach, and is otherwise distinguishable from the circumstances presented here. In support of their contrary contention, appellant and her *amicus curiae* cite the following passage in *Freeman*: "While the trooper undoubtedly suspected that Freeman wished to conceal the fact that she was traveling with the other vehicle, such

suspicion had been present when he gave Freeman a warning and told her that she was free to go. Nothing had happened after the conclusion of the traffic stop to provide any further cause for suspicion[.]" *Freeman*, 757 A.2d at 908. A superficial reading of this isolated language might support a rule requiring courts to ignore facts gathered during an initial lawful traffic stop when determining whether there was reasonable suspicion for a subsequent investigative detention. However, a more careful review of the entire decision reveals appellant's constricted reading ignores the full breadth of the *Freeman* Court's analysis and holding. *See Kemp*, 961 A.2d at 1257-58 (*Ortiz* and *Johnson* misconstrued *Freeman* when relying on it for proposition that facts gathered during initial traffic stop may not be used to justify secondary detention).

The *Freeman* Court recognized that, in order to be a valid investigative detention during which consent to search might be properly obtained, "the seizure must be justified by an articulable, reasonable suspicion that Freeman may have been engaged in criminal activity **independent of that supporting her initial detention**" (the reason she was pulled over in the first place) and this question must be answered "by examining **the totality of the circumstances**[.]" *Freeman*, 757 A.2d at 908 (emphasis added). It is clear the Court considered Freeman's concealment of the fact she was traveling with the other vehicle to be inadequate to provide reasonable suspicion for a second detention and there were no other facts to support any such suspicion, beyond the initial observations which led to the traffic stop in the first place. *Id*. The Court explained: "In particular, there was no testimony that the actions of Freeman and her companions were consistent with those of drug dealers or criminals of any other type; that their route was heavily traveled by drug dealers; or, indeed, that the trooper suspected Freeman of drug dealing or any other specific crime." *Id*. Such information would have contributed to reasonable suspicion clearly based on the totality of the circumstances, including any

information gleaned during the initial traffic stop. However, in the absence of such additional information, Freeman's consent was given during an illegal detention and suppression was warranted. Most importantly, and contrary to appellant's argument, *Freeman* does not stand for the proposition that information lawfully obtained during an initial traffic stop cannot be used to support the requisite suspicion for a second detention after a "break" in contact, simply because such information was not present in that case. Furthermore, our reading of *Freeman* comports with, and is supported by, the *Rodriguez* decision. *See Rodriguez*, 135 S.Ct. at 1615 (officer may prolong traffic stop so long as "reasonable suspicion ordinarily demanded to justify detaining an individual" is present).

Accordingly, we confirm that "all relevant facts" and the "whole picture" necessarily includes any information learned by a police officer during an initial lawful traffic stop, irrespective of whether or not the officer suggests at some point during that stop that the subject of the stop is free to leave or tells him or her to "have a good night." Unlike in *Freeman*, here it is clear based on the totality of circumstances derived from the initial stop — which included the odor of marijuana noted by Sergeant Still along with his observations of appellant's sluggish and confused appearance and Lewis's furtive movements — that he had reasonable suspicion to conduct a second detention of appellant. Accordingly, we hold appellant consented to the vehicle search during a legal investigative detention, and suppression of the evidence discovered during that search was not warranted.[12]

Order affirmed.

Chief Justice Saylor and Justices Todd and Mundy join the opinion.

---

[12] To the extent the Superior Court's decision in *Nguyen* holds police officers may not use information gathered during an initial traffic stop to justify a second detention, that decision is now specifically overruled.

Justice Baer files a concurring opinion in which Justice Donohue joins.

Justice Wecht did not participate in the consideration or decision of this case.